Laurence M. Rosen, Esq. (SBN 219683)
**THE ROSEN LAW FIRM, P.A.**
355 South Grand Avenue, Suite 2450
Los Angeles, CA 90071
Telephone: (213) 785-2610
Facsimile: (213) 226-4684
Email: lrosen@rosenlegal.com

*Counsel for Plaintiff*

## UNITED STATES DISTRICT COURT
## CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| HAMID KARAMIAN, derivatively on behalf of FISKER INC., | Case No. |
| Plaintiff, | **VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT** |
| v. | <u>JURY TRIAL DEMANDED</u> |
| HENRIK FISKER, GEETA GUPTA-FISKER, MARK E. HICKSON, JOHN FINNUCAN, RODERICK K. RANDALL, WILLIAM R. MCDERMOTT, NADINE L. WATT, WENDY J. GREUEL, and MITCHELL ZUKLIE, | |
| Defendants, | |
| and | |
| FISKER INC., | |
| Nominal Defendant. | |

## **INTRODUCTION**

Plaintiff Hamid Karamian ("Plaintiff"), by and through his undersigned counsel, derivatively on behalf of Nominal Defendant Fisker Inc. ("Fisker" or the "Company"), files this Verified Stockholder Derivative Complaint against Henrik Fisker ("H. Fisker"), Geeta Gupta-Fisker ("Gupta-Fisker"), Mark E. Hickson ("Hickson"), John Finnucan ("Finnucan"), Roderick K. Randall ("Randall"), William, R. McDermott ("McDermott"), Nadine L. Watt ("Watt"), Wendy J. Greuel  ("Greuel") and Mitchell Zuklie ("Zuklie") (collectively, the "Individual Defendants" and with Fisker, "Defendants"), for among other things, breach of fiduciary duties to Fisker, violations of Section 10(b) of the Securities Exchange Act of 1934 ("Exchange Act") and for contribution under Sections 10(b) and 21 of the Exchange Act.

Plaintiff alleges the following upon information and belief, except as to those allegations concerning Plaintiff, which are alleged upon personal knowledge. Plaintiff's information and belief is based upon, among other things, their counsel's investigation, which included review and analysis of the Company's filings with the United States Securities and Exchange Commission (the "SEC"), corporate governance documents published on the Company's website, transcripts of Fisker's conference calls with financial analysts and investors, news reports, financial analyst reports, public filings filed in the putative securities class action *Zahabi v. Fisker Inc., et al.,* 2:23-cv-00976 pending in the United States District Court for the Central District of California (the "Securities Class Action"), and other publicly available information about Fisker. Plaintiff believes that substantial additional evidentiary support will exist for the allegations after a reasonable opportunity for discovery.

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

## <u>NATURE OF THE ACTION</u>

1.     This is a stockholder derivative action brought on behalf of Fisker against certain officers and the members of Fisker's Board of Directors (the "Board") for their breaches of fiduciary duties, violations of the federal securities laws, and other misconduct, which occurred between August 3, 2023 and November 20, 2023 (the "Relevant Period"), and resulted in substantial damage to Fisker and its stockholders.

2.     Fisker, founded by H. Fisker and Gupta-Fisker in 2016, is an electric vehicle company that develops sustainable, luxury vehicles.

3.     This is the second electric vehicle company founded by H. Fisker and Gupta-Fisker, the first being Fisker Automotive, which declared bankruptcy in 2014.

4.     Fisker began publicly trading in 2020, after merging with the special acquisition company ("SPAC"), Spartan Energy Acquisition Corp.

5.     Upon its public listing, Fisker began to develop the Fisker Ocean, a fully-electric sports utility vehicle ("SUV"). Although Fisker is developing and accepting reservations for other models (the Pear, the Alaska, and the Ronin), the Ocean is the Company's only vehicle that has been launched and is available for purchase. The Ocean costs over $38,000.

6.     By March 31, 2022, the Company had over 40,000 reservations for the Ocean. On June 23, 2023, the Company made its first United States deliveries (22 total) of the Ocean.

7.     During the Relevant Period, the Individual Defendants harmed Fisker, causing the Company's stock to lose over half of its value between November 7, 2023 ($4.37 per share at close) and November 21, 2023 ($2.00 per share at close). The precipitous decline in Fisker's stock price was due to several disclosures that

revealed that previously issued statements were false and misleading.

8.      These disclosures included: (i) the Company's November 8, 2023 announcement that the financial statements and related disclosures were delayed due to the departure of the Company's former Chief Accounting Officer ("CAO") and the timing of the appointment of its new CAO; (ii) the Company's November 13, 2023 revelations that it would not be able to file its Form 10-Q on time for the quarter ending September 30, 2023, that it had accounting issues, that delivery and service infrastructure was limiting deliveries, and that it was slashing its production forecast; and (iii) the Company's November 20, 2023 revelation that the Company's new CAO had tendered his notice of intent to resign on November 14, 2023, effective immediately.

9.      The action seeks to recover monetary damages to remedy the harm done to the Company and to obtain corporate governance reforms to protect Fisker and its stockholders from a recurrence of the harmful events described below.

10.     Throughout the Relevant Period, the Individual Defendants made materially false and/or misleading statements and/or failed to disclose material adverse facts about the Company's business, operations, and prospects.

11.     Specifically, the Individual Defendants misled investors by withholding the following information from its investors: (i) Fisker had "material weaknesses" in "internal control over financial reporting"; (ii) Fisker had inaccurately accounted for certain costs and expenses; (iii) Fisker's weaknesses with financial reporting and inaccurate accounting would likely result in delayed filing of its Form 10-Q; and (iv) Fisker's deliveries were limited by delivery and service infrastructure. The Individual Defendants magnified their failure to disclose these infrastructure problems by making misleading, positive statements about increased production rates that painted a positive, but inaccurate picture of

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

Fisker's prospects.

12.     As a direct and proximate result of the misconduct described herein by the Individual Defendants, Fisker has sustained significant damages as described below.

## JURISDICTION AND VENUE

13.     This Court has subject matter jurisdiction over the claims asserted herein pursuant to 28 U.S.C. § 1331 and Section 27 of the Exchange Act because Plaintiff's claims raise a federal question under Section 10(b) of the Exchange Act (15 U.S.C. § 78j(b)), Rule 10-b5 promulgated thereunder (17 C.F.R. § 240.10b-5), and Section 21D of the Exchange Act (15 U.S.C. § 78u-4(f)).

14.     This Court has supplemental subject matter jurisdiction over Plaintiff's state law claims pursuant to 28 U.S.C. § 1367(a).

15.     This derivative action is not a collusive action designed to confer jurisdiction on a court of the United States that it would not otherwise have.

16.     This Court has jurisdiction over each Defendant because each Defendant resides in this District or has sufficient minimum contacts with this District to render the exercise of jurisdiction by the Court permissible under traditional notions of fair play and substantial justice.

17.     Venue is proper in this District pursuant to 28 U.S.C. §§ 1391 and 1401 because a substantial portion of the transactions and wrongs complained of herein occurred in this District, Defendants have conducted business in this District, Fisker's headquarters are located in this District, and Defendants' actions have had an effect in this District.

## THE PARTIES

18.     Plaintiff is a current shareholder of Fisker and has continuously held Fisker stock at all relevant times.

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

19.     Nominal Defendant Fisker is an electric vehicle company incorporated in Delaware. Fisker's headquarters and principal executive offices located at 1888 Rosecrans Avenue, Manhattan Beach, California 90266. Fisker's common stock trades on the New York Stock Exchange ("NYSE") under the ticker symbol "FSR".

20.     Defendant H. Fisker is the Company's co-founder, Chief Executive Officer ("CEO"), and Chairman of the Board ("Chairman"). He has continuously served as CEO and Chairman since Fisker's creation in 2016. He is married to Defendant Gupta-Fisker. The Company paid H. Fisker $738,255 for the fiscal year ending December 31, 2022 ("2022 Fiscal Year"). This amount included $710,000 in bonus, $62,400 in salary, and $10,855 in other compensation. Fisker's proxy statement filed with the SEC on August 3, 2023 ("August 2023 Proxy") states that, as of June 28, 2023, H. Fisker owned 81,867,237 shares of the Company, representing 22.9% total ownership and 43.7% total voting power. Together, H. Fisker and his wife Gupta-Fisker had 87.4% total voting power in the Company. H. Fisker is a defendant in the Securities Class Action.

21.     Defendant Gupta-Fisker is the Company's co-founder, Chief Operating Officer ("COO") and Chief Financial Officer ("CFO"). She has served as a member of the Board since October 2020. She is married to H. Fisker. The Company paid Gupta-Fisker $778,585 for the 2022 Fiscal Year. This amount included $710,000 in bonus, $62,400 in salary, and $6,185 in other compensation. The August 2023 Proxy states that, as of June 28, 2023, Gupta-Fisker owned 81,867,237 shares of the Company, representing 22.9% total ownership and 43.7% total voting power. Together, Gupta-Fisker and her husband, H. Fisker, had 87.4% total voting power in the Company. Gupta-Fisker is a defendant in the Securities Class Action

22.     Defendant Hickson is and has continuously been a Board member

– 6 –

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

since July 2020. Hickson is a member of the Audit Committee and the Nominating and Corporate Governance Committee. Hickson received $247,028 in compensation from the Company during the 2022 Fiscal Year. This amount included $15,000 in fees earned or cash paid and awards of $232,028.

23. Defendant Finnucan was the Company's CAO from October 12, 2020 until his resignation, effective October 27, 2023. Finnucan received $436,661 in compensation from the Company during the 2022 Fiscal Year. This amount included $325,000 in salary, $97,490 in stock awards, and $14,171 in other compensation. Finnucan is a defendant in the Securities Class Action

24. Defendant Randall is and has continuously been a Board member since March 2018. Randall is a member of the Compensation Committee. Randall received $239,528 in compensation from the Company during the 2022 Fiscal Year. This amount included $7,500 in fees earned or cash paid and awards of $232,028.

25. Defendant McDermott is and has continuously been a Board member since October 2020. McDermott is a member of the Audit Committee. McDermott received $267,028 in compensation from the Company during the 2022 Fiscal Year. This amount included $35,000 in fees earned or cash paid and awards of $232,028.

26. Defendant Watt is and has continuously been a Board member since June 2020. Watt is the Chair of the Compensation Committee. Watt received $250,028 in compensation from the Company during the 2022 Fiscal Year.

27. Defendant Greuel is and has continuously been a Board member since June 2020. Greuel is the Chair of the Audit Committee. Greuel received $257,028 in compensation from the Company during the 2022 Fiscal Year. This amount included $25,000 in fees earned or cash paid and awards of $232,028.

28. Defendant Zuklie is and has continuously been a Board member since March 2021. Zuklie is the Chair of the Nominating and Corporate Governance

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

Committee. Zuklie received $242,028 in compensation during the 2022 Fiscal Year. This amount included $10,000 in fees earned or cash paid and awards of $232,028.

## THE INDIVIDUAL DEFENDANTS' FIDUCIARY DUTIES

29.     At all times relevant to this case, the conduct of the Individual Defendants was governed by well-recognized rules designed to protect the Company and its stockholders.

30.     The Individual Defendants were and are required to further the best interests of the Company and its stockholders to benefit all stockholders equally and not to further their own personal interest or benefit.

31.     Because of their positions as officers and/or directors of the Company and their ability to control its business and corporate affairs, the Individual Defendants owed the Company and its stockholders fiduciary obligations of care, good faith, oversight, loyalty, and candor. The Individual Defendants were required to exercise good faith and diligence in the administration of the Company's affairs and the use and preservation of its property and assets. The Individual Defendants were required to use their utmost ability to control and manage the Company in a fair, just, honest, and equitable manner.

32.     Because of their executive, managerial, directorial, and controlling positions as directors and/or officers of the Company, the Individual Defendants had access to negative, nonpublic information about Fisker. As such, they were able to and did, directly and/or indirectly, exercise control over the wrongful acts alleged herein.

33.     To discharge their duties, the Individual Defendants were required to exercise reasonable and prudent supervision over the management, policies, practices, and controls of the Company.

34.     By virtue of such duties, the officers and directors of Fisker, including

the Individual Defendants, were required to, *inter alia*:

    a.    Ensure that the Company complied with its legal obligations and requirements, including acting only within the scope of its legal authority under all applicable federal, state, and local laws, rules, and regulations, including disseminating truthful and accurate statements to the SEC and the investing public;

    b.    Conduct the affairs of the Company in a lawful, efficient, and business-like manner to make it possible for the Company to provide the highest quality performance of its business, to avoid wasting the Company's assets, and to maximize the value of the Company's stock;

    c.    Properly and accurately inform investors and analysts as to the true financial condition of the Company at any given time, make accurate statements about the Company's financial results and prospects, and ensure that the Company maintained an adequate system of financial controls such that the Company's financial reporting would be true and accurate at all times;

    d.    Remain informed as to how the Company conducted its operations, and, upon notice of imprudent or unsound conditions or practices, make reasonable inquiry into the nature and cause of such conditions and practices, correct such conditions or practices, and make such disclosures as necessary to comply with federal and state securities laws; and

    e.    Ensure that the Company was operated in a diligent, honest, and prudent manner in compliance with all applicable federal, state, and local laws, rules, and regulations.

35.    The Individual Defendants knowingly violated their obligations as directors and/or officers of the Company, acting without good faith and consciously disregarding their duties to the Company and its stockholders despite their knowledge of the risk of serious injury to the Company.

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

36.     During the Relevant Period, the Individual Defendants were the agents of each other and acted within the course and scope of this agency.

37.     Because of their positions of control and authority, the Individual Defendants exercised control over the wrongful acts complained of herein and the contents of the various public statements issued by Fisker.

38.     In addition to these general duties, the Individual Defendants were also at all relevant times bound by Fisker's corporate governance documents.

## FISKER'S CODE OF BUSINESS CONDUCT AND ETHICS

39.     The Board adopted the Company's Code of Business Conduct and Ethics (the "Code") in June 2022. The Code is designed to deter wrongdoing by setting expectations and providing guidelines for the Board. The Individual Defendants were at all times responsible for reading, understanding, and following the guidance in the Code.

40.     The Code includes a "Legal Compliance" section, which states in pertinent part: "All employees must always obey the law while performing their duties to the Company. The Company's success depends upon each employee operating within legal guidelines and cooperating with authorities. It is essential that all employees know and understand the legal and regulatory requirements that apply to the Company's business and to their specific area of responsibility."

41.     The Code further includes a "Conflicts of Interest" section, which states in pertinent part: "Employees are expected to avoid actual or apparent conflicts of interest between their personal and professional relationships. For directors, this may include recusal from discussions of the Board when their participation could be perceived as creating such a conflict. A 'conflict of interest' occurs when a personal interest interferes in any way (or even appears or could reasonably be expected to interfere) with the interests of the Company as a whole."

42. The Code also includes a "Financial Integrity; Public Reporting" section, which states in pertinent part:

> The Company strives to maintain integrity of the Company's records and public disclosure. The Company's corporate and business records, including all supporting entries to the Company's books of account, must be completed honestly, accurately and understandably. The Company's records are important to investors and creditors. They serve as a basis for managing the Company's business and are important in meeting the Company's obligations to business partners, suppliers, vendors, creditors, employees and others with whom the Company does business. The Company depends on the books, records and accounts accurately and fairly reflecting, in reasonable detail, the Company's assets, liabilities, revenues, costs and expenses, as well as all transactions and changes in assets and liabilities.
>
> To help ensure the integrity of the Company's records and public disclosure, the Company requires that:
>
> • no entry be made in the Company's books and records that is intentionally false or misleading;
> • transactions be supported by appropriate documentation;
> • the terms of sales and other commercial transactions be reflected accurately in the documentation for those transactions and all such documentation be reflected accurately in the Company's books and records;
> • employees comply with the Company's system of internal controls and be held accountable for their entries;
> • any off-balance sheet arrangements of the Company are clearly and appropriately disclosed;
> • employees work cooperatively with the Company's independent auditors in their review of the Company's financial statements and disclosure documents;
> • no cash or other assets be maintained for any purpose in any unrecorded or "off-the-books" fund; and
> • records be retained or destroyed according to the Company's document retention policies or procedures then in effect.

– 11 –

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

43.     The Code further includes a "Conduct of Senior Financial Employees" section, which states in pertinent part "that the Chief Executive Officer, Chief Financial Officer, Chief Accounting Officer, Corporate Controller and any other persons performing similar functions . . . [a]ct with honesty and integrity and use due care and diligence in performing their responsibilities to the Company."

## **FISKER'S AUDIT COMMITTEE CHARTER**

44.     Fisker's Audit Committee maintains a charter (the "Charter") that imposes additional duties on members of the Audit Committee. According to the Charter, the Audit Committee's stated purpose is to:

> (A) assist the Board in overseeing (1) the integrity of the Company's financial statements, (2) the Company's compliance with legal and regulatory requirements, (3) the independent auditor's qualifications and independence, and (4) the performance of the Company's internal audit function and independent auditors; (B) provide such reports as may be required of an audit committee under the rules and regulations promulgated under the Securities Exchange Act of 1934, as amended (the "Exchange Act"); and (C) provide oversight with respect to ethical conduct and any related matters.

45.     Under a section entitled "Membership & Organization," the Charter states, in relevant part, that "[e]ach member of the Committee must be able to read and understand fundamental financial statements, including the Company's balance sheet, income statement and cash flow statement."

46.     Under a section entitled "Authority and Responsibilities", the Charter states, in relevant part:

> The Committee is charged by the Board with the authority and responsibility to:
>
> *        *        *
>
> [] On behalf of the Board, oversee the principal risk exposures

– 12 –

facing the Company and the Company's mitigation efforts in respect of such risks, including, but not limited to financial reporting risks, credit and liquidity risks, and environmental and sustainability risks.

*    *    *

[] Review and discuss with the independent auditor and management their periodic reviews of the adequacy of the Company's accounting and financial reporting processes and systems of internal control, including any significant deficiencies and material weaknesses in their design or operation.

## SUBSTANTIVE ALLEGATIONS

47.    The Relevant Period begins on August 3, 2023 when Fisker filed the August 2023 Proxy with the SEC. Defendants H. Fisker, Gupta-Fisker, Hickson, Randall, McDermott, Watt, Greuel, and Zuklie solicited the August 2023 Proxy.

48.    The August 2023 Proxy sought stockholder approval of several measures including: (i) "the potential issuance of more than 19.99% of the outstanding shares of Common Stock"; and (ii) "adopt[ion] [of] an amendment to the Company's Second Amended and Restated Certificate of Incorporation to increase the total number of shares of Class A Common Stock that the Company will have authority to issue from 750,000,000 shares to 1,250,000,000 shares" (internal parentheticals omitted).

49.    The August 2023 Proxy contained materially false and misleading statements as it failed to disclose to Fisker investors that: (i) Fisker had "material weaknesses" in "internal control over financial reporting"; (ii) Fisker improperly accounted for certain costs and expenses; (iii) Fisker's weaknesses in its financial reporting and improper accounting would likely result in delayed filing of its quarter report on Form 10-Q with the SEC; and (iv) Fisker's deliveries were limited by delivery and service infrastructure. The statements contained in the

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

August 2023 Proxy were also false and misleading because they did not disclose delivery and service infrastructure problems, instead focusing on positive statements about ramping up the production phase.

50.   As a result, the positive statements in the August 2023 Proxy about the Company's business model, operations, and prospects were materially false or misleading and lacked a reasonable basis of belief to support them. For example, the August 2023 Proxy stated that:

> We achieved several key milestones in May, June and July 2023, including (i) the opening of two customer facilities in Munich, Germany; (ii) the initiation of the production ramp up phase for the Fisker Ocean; (iii) the achievement by the all-electric Fisker Ocean Extreme with 20 inch wheels of an EPA estimated total range of 360 miles; (iv) the receipt by the Fisker Ocean Extreme of both an EPA Certificate of Conformity and a California Air Resources Board Executive Order; (v) ***the commencement of deliveries of the limited edition Fisker Ocean One in Europe and the United States; (vi) the production of 1,022 vehicles during the second quarter for customer deliveries as well as units designated for engineering and marketing use; (vii) the publishing of our inaugural Lifecycle Assessment report***; and (viii) investing in additional battery pack capacity to protect the compressed manufacturing timeline this year and support higher volumes next year than originally anticipated.[1]

51.   The following day, on August 4, 2023, Fisker filed a Form 8-K with the SEC, attaching a press release entitled, "Fisker Inc. Announces Second quarter 2023 Financial Results" (the "August Press Release"). The August Press Release announced Fisker's second quarter 2023 financial results, stating in part:

---

[1] Unless otherwise noted, all emphasis is added.

– 14 –

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

Recent Updates:

*     *     *

- 1,022 Fisker Ocean vehicles were produced in Q2 2023. A couple of suppliers had challenges ramping to targeted Q2 levels, but the company is intently focused on working with all suppliers to swiftly ramp. In July, 1,009 Fisker Oceans were produced up from 741 units in June while the assembly rate per day reached 140 at the end of July, up from 80 per day at the end of June. July had reduced shifts and fewer working days due to the planned Magna Steyr annual summer shutdown.
- Fisker updates 2023 production outlook to 20,000-23,000 units as a key supplier required additional time to ramp their capacity to meet our 2H 2023 timeline.
- The Company began US and European deliveries of the Fisker Ocean One in California, Denmark and Germany with 11 customer deliveries completed in 2Q partly due to a later start in the quarter, logistics optimization, and extra time required to accumulate appropriate quantities for efficient transport.

*     *     *

Second Quarter 2023 Financial Highlights:

- Revenue totaled $825 thousand compared to revenue of $10 thousand in the second quarter of 2022.
- Gross margin was 7.5% on a reported basis, and 18.5% excluding discounted early-stage investor deliveries.
- Loss from operations totaled $87.9 million, including $9.0 million of stock-based compensation expense.
- Net loss totaled $85.5 million and $0.25 loss per share. Weighted average shares outstanding totaled 335.9 million for the three months ended June 30, 2023.
- Net cash used in operating activities totaled $128.1 million and capital expenditures totaled 91.3 million.
- Cash and cash equivalents and restricted cash was $521.8 million as of June 30, 2023; this excludes $300 million in gross proceeds from the July convertible note offering and $33.4 million in VAT

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

> receivables which we expect to receive as refunds or to monetize against vehicle sales taxes.

2023 Business Outlook

> Fisker expects to produce 20,000-23,000 units in 2023, provided Fisker's suppliers and partners can support this volume and ramp. The following information reflects Fisker's expectations for key non-GAAP operating expenses and capital expenditures for full-year 2023. Fisker is projecting the total of these items to be within a range of $565 million to $640 million. Fisker anticipates an 8-12% gross margin range for full year 2023 provided input costs do not change dramatically.

52.   The August Press Release contains the following statement from Defendant H. Fisker: "[w]e are currently in a quarter that truly marks the inflection for Fisker - *our business model has now been proven*, by the fact that we are already making a positive profit margin on the first vehicles we are selling."

53.   On August 9, 2023, Fisker filed its quarterly report for the period ending June 30, 2023 on Form 10-Q with the SEC (the "2Q23 10-Q"). The 2Q23 10-Q was signed by Defendant Gupta-Fisker. Attached to the 2Q23 10-Q were certifications pursuant to the Sarbanes-Oxley Act of 2002 signed by Defendants H. Fisker and Gupta-Fisker attesting to the accuracy of financial reporting, the disclosure of any material changes to the Company's internal control over financial reporting and the disclosure of all fraud.

54.   The 2Q23 10-Q contained Fisker's financial results for that quarter and touted the recent developments, stating in relevant part:

**Recent Developments**

We achieved several key milestones in May, June, July, and August 2023, including (i) the opening of customer facilities in Munich, London, Oslo and Stockholm; (ii) the initiation of the production ramp up phase for the Fisker Ocean; (iii) the achievement by the Fisker Ocean Extreme with 20 inch wheels of an EPA estimated total range

– 16 –

of 360 miles; (iv) the receipt by the Fisker Ocean Extreme of both an EPA Certificate of Conformity and a California Air Resources Board Executive Order; *(v) the commencement of deliveries of the limited edition Fisker Ocean One in Europe and the United States; (vi) the production of 1,022 Fisker Oceans during the second quarter for customer deliveries, as well as units designated for engineering and marketing use;* (vii) the production of 1,009 Fisker Oceans in July – reaching an assembly rate of 140 vehicles per day at the end of month; (viii) the publishing of our inaugural Lifecycle Assessment report; (ix) the investment in additional battery pack capacity in July to support higher volumes next year; (x) bolstering the balance sheet with a successful offering of $340 million in aggregate principal of 0% senior unsecured convertible notes due in 2025; (xi) completing Fisker's first large-scale media event with production vehicles in Vienna, Austria where two dozen media correspondents test drove Fisker Oceans; and (xii) revealing Fisker's future product lineup at the company's inaugural Product Vision Day.

*         *         *

As outlined earlier this year, our production forecasts are linked to supply chain readiness and receipt of multiple regulatory homologation approvals across our launch markets. The timing of these approvals shifted in the first half of this year, which impacted our 2023 volume forecasts and supplier ramp readiness. ***Based on our current supplier capacity expectations, we currently forecast we will produce 20,000 to 23,000 vehicles during 2023.***

55.    The 2Q23 10-Q continued to discuss Fisker's revenues and cost of revenues, stating in relevant part:

*Revenue and Cost of Revenues*

In the second quarter of 2023, we began producing vehicles for deliveries to our customers and, accordingly, we are recognizing vehicle revenues from the sale of initial Fisker Ocean SUVs. Merchandise sales and home charging solutions are not intended to comprise a significant portion of the Company's revenues. Over the course of the second half of 2023, we will ramp production volumes at a measured pace to help facilitate the delivery of high-quality

– 17 –

components from suppliers in line with our serial production run-rate.

During the three month period ended June 30, 2023, the Company delivered 11 vehicles and recognized net revenue of $712 thousand with related cost of revenues totaling $665 thousand resulting in gross profit of $47 thousand. Gross profit from vehicle sales is lower due to discounts on vehicles sold to certain investors who held rights to a free SUV based on Fisker's base trim level. Before the completion of the Company's Business Combination, a small group of investors received a right to a free SUV in return for lower interest rates on convertible notes issued by the Company. At the time of the issuances, the Company allocated amounts based on relative fair values of the convertible notes and the right to a free SUV, which is included in Customer Deposits on the Consolidated Balance Sheet. The difference between the allocated amount and the MSRP of a Fisker Ocean Sport represents a reduction in revenue as it lowers the transaction price. The Company had no vehicle sales during the corresponding three month period ended June 30, 2022.

56.     The 2Q23 10-Q also included the following chart showing the Company's inventory numbers (in thousands):

**As of June 30, 2023**

|  |  |
|---|---|
| Raw materials | $ 109,090 |
| Work in progress | 61,886 |
| Finished goods | 2,020 |
| Total | $ 172,996 |

57.     Additionally, the 2Q23 10-Q included the following about convertible notes:

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

The following table presents the potential common shares outstanding that were excluded from the computation of diluted net loss per share of common stock as of the periods presented because including them would have been antidilutive:

| | **As of June 30,** | |
| --- | --- | --- |
| | **2023** | **2022** |
| Convertible senior notes | 33,891,845 | 33,891,845 |
| Stock options and warrants | 36,936,742 | 30,561,179 |
| Total | 70,828,587 | 64,453,024 |

58.   The statements included in ¶¶47-57 were materially false and misleading and omitted to state material adverse facts necessary to make the statements not misleading. In particular, the Individual Defendants failed to disclose the following about Fisker's operations, business, and prospects, including: (i) Fisker had "material weaknesses" in "internal control over financial reporting"; (ii) Fisker inaccurately accounted for certain costs and expenses; (iii) Fisker's weaknesses in its financial reporting and improper accounting would likely result in delayed filing of its quarterly report on Form 10-Q with the SEC; and (iv) Fisker's deliveries were limited by delivery and service infrastructure. These statements were also false and misleading and/or lacked a reasonable basis of belief because they did not disclose delivery and service infrastructure problems, instead focusing on positive statements about ramping up the production phase.

## The Truth Emerges

59.   Eventually, the truth began to emerge in a series of disclosures. First, on September 19, 2023, Defendant Finnucan, Fisker's CAO, provided notice that he intended to resign effective on October 27, 2023. In response, Fisker hired

Florus Beuting ("Beuting") as the new CAO effective November 6, 2023

60.     On November 8, 2023, prior to trading hours, Fisker announced that it was unable to timely complete its financial statements and associated disclosures due to the departure of Finnucan and the timing of the appointment of Beuting as the new CAO despite Finnucan providing notice of planned resignation almost two months prior. The Company announced that it "expect[ed] to file its Form 10-Q by November 14, 2023."

61.     On this news, Fisker's stock price fell from a closing price of $4.37 per share on November 7, 2023 to a closing price of $3.99 per share on November 8, 2023, a decline of approximately 8.7%.

62.     A few days later, on November 13, 2023, Fisker released its press release entitled "Fisker Inc. Announces Third Quarter 2023 Financial Results." This press release disclosed the Company's financial results for the third quarter of 2023 that reported: (i) a net loss of approximately $91 million and $0.27 loss per share; (ii) research and development ("R&D") costs and expenses of approximately $9.42 million; and (iii) selling, general and administrative costs and expenses of $78.02 million. Together, the operating costs and expenses totaled approximately $87.45 million for the quarter ending September 30, 2023. The press release also revealed that the Company was downscaling production of its Ocean vehicles announcing that only 1,097 were delivered to customers despite building 4,725 Oceans during the third quarter.

63.     Also on November 13, 2023, the Company announced it was unable to timely file its Form 10-Q with the SEC for the quarter ending September 30, 2023. In lieu of filing the Form 10-Q, Fisker filed an NT 10-Q which stated in part:

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

As previously disclosed, the timing of the appointment a new chief accounting officer effective November 6, 2023 and the departure of the former chief accounting officer effective October 27, 2023 delayed the completion of the Company's financial statements and related disclosures, and delayed the completion of the Company's quarterly assessment of the effectiveness of its disclosure controls and procedures.

In the course of completing the preparation of the Report, *the Company determined that it has material weaknesses in the Company's internal control over financial reporting*. These material weaknesses will be discussed in the Report.

64.     Additionally, in the NT 10-Q Fisker answered in the affirmative to the question, "Is it anticipated that any significant change in results of operations from the corresponding period for the last fiscal year will be reflected by the earnings statements to be included in the subject report or portion thereof?"

65.     Also on November 13, 2023, the Company held a conference call in which Defendants revealed that the Form 10-Q was delayed in part because "Q3 was a very complex quarter" which involved "very complex accounting along with convertible notes and accounting for derivative." Defendant Gupta-Fisker continued, in part:

Q3 was a highly complex quarter. Went from $800,000 of revenue to $71 million of revenue. In multiple countries, ForEx, very complex accounting along with convertible notes and accounting for derivatives. So we experienced quite a lot of complexity in the business, and as you rightly pointed out, personnel changes as well. We, of course, continue to understand all these different areas.

We are continuing to hire...Some other areas that were extremely complex were because of contract manufacturing, things like raw material inventory accounting and finished goods inventory accounting, things that we had not done before and extremely complex as you look at IT integrations with Magna, inhouse integrations.

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

So these are unfortunately growing pains and we are addressing all these different areas so we can also mature our systems, hire more people, hire more talent to address all these different areas, and it's a work in progress. We are working tirelessly, very hard to get the queue done, so more to come on that.

66. Later on the conference call, it was revealed that delivery and service infrastructure rather than production or demand were the factors behind limited deliveries. Specifically, Gupta-Fisker stated:

> ***Neither our production nor demand are limiting our deliveries, but rather it's the delivery and the service infrastructure***. We have a great product and our customers want the product. We are in the process of dramatically overhauling our service and delivery infrastructure to keep up with the demand until the delivery process has reached our goal, which we expect later this year.

67. Also on the conference call, there was a discussion about Fisker's production forecast for the full year of 2023, revising the guidance from 13,000 to 17,000 units, which was down from guidance of 20,000 to 23,000 units.

68. On this news, Fisker's stock price fell from a closing price of $4.11 per share on November 13, 2023 to a closing price of $3.34 per share on November 14, 2023, a decline of over 18.7%.

69. Then, on November 20, 2023, after trading hours, Fisker disclosed that Beuting, who had only became the Company's CAO on November 6, 2023, provided his notice of intent to resign on November 14, 2023, effective immediately.

70. On this news, Fisker's stock price fell from a closing price of $2.35 per share at close on November 20, 2023 to a losing price of $2.00 per share on November 23, 2023, a decline of approximately 14.9%.

71. On November 22, 2023, Fisker filed its quarterly report on Form 10-Q with the SEC for the period ending September 30, 2023. The quarterly report

– 22 –

revealed in part:

> Subsequent to the release of our preliminary earnings results on November 13, 2023, **we identified approximately $20 million of expenses that were related to services performed after the start of production of salable vehicles**. The expenses were incorrectly recorded primarily as selling, general and administrative expenses in our preliminary earnings results, but were later determined to be associated with production set-up activities and are now appropriately reflected in cost of revenues. Additionally, other inventory adjustments were recorded resulting in a $4.0 million increase in net loss subsequent to the preliminary earnings results.

72. Further, this 10-Q reported: (1) a net loss of $95,219,000 million for the three months ending September 30, 2023 and a net loss of $298,381,000 for the nine months ended September 30, 2023; (2) R&D costs and expenses of $13,428,000; and (3) selling, general and administrative costs and expenses of $57,650,000. Together, the operating costs and expenses totaled $71,078,000 for the quarter ending September 30, 2023.

## DAMAGES TO FISKER

73. As a result of the Individual Defendants' misconduct, Fisker disseminated false and misleading public statements concerning the Company's business, operations, prospects, and internal controls. The Individual Defendants' misconduct has damaged Fisker's credibility.

74. As a direct and proximate result of the Individual Defendants' actions, Fisker has expended, and will continue to expend, significant sums of money defending and paying any settlement in the Securities Class Action.

75. The monetary damages also include legal and investigative defense costs, internal investigation costs, and payment of fines associated with the Company's violations.

76. As a direct and proximate result of the Individual Defendants' actions

– 23 –

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

as alleged above, Fisker's market capitalization has been substantially damaged, losing millions of dollars in value because of the conduct described herein.

77.    In addition, the actions of the Individual Defendants have irreparably damaged Fisker's corporate image and goodwill. For at least the foreseeable future, Fisker will suffer from what is known as the "liar's discount," a term applied to the stocks of companies that have been implicated in illegal behavior and have misled the investing public, such that Fisker's ability to raise equity capital or debt on favorable terms in the future is now impaired.

## CONSPIRACY, AIDING AND ABETTING, AND CONCERTED ACTION

78.    In committing the wrongful acts alleged herein, the Individual Defendants have pursued, or joined in the pursuit of, a common course of conduct, and have acted in concert with and conspired with one another in furtherance of their wrongdoing. The Individual Defendants caused the Company to conceal the true facts as alleged herein. The Individual Defendants further aided and abetted and/or assisted each other in breaching their respective duties.

79.    The purpose and effect of the conspiracy, common enterprise, and/or common course of conduct was, among other things, to: (1) facilitate and disguise the Individual Defendants' violations of law, including breaches of fiduciary duty, aiding and abetting breach of fiduciary duties, unjust enrichment, waste of corporate assets, gross mismanagement, abuse of control, and violations of the Exchange Act; (2) conceal adverse information concerning the Company's operations, financial condition, future business prospects and internal controls; and (3) artificially inflate the Company's stock price.

80.    The Individual Defendants accomplished their conspiracy, common enterprise, and/or common course of conduct by causing the Company to purposefully or recklessly conceal material facts, fail to correct such

misrepresentations, and violate applicable laws. In furtherance of this plan, conspiracy, and course of conduct, the Individual Defendants collectively and individually took the actions set forth herein.

81.    Each of the Individual Defendants aided and abetted and rendered substantial assistance in the wrongs complained of herein. In taking such actions to substantially assist the commission of the wrongdoing complained of herein, each of the Individual Defendants acted with actual or constructive knowledge of the primary wrongdoing, either took direct part in, or substantially assisted in the accomplishment of that wrongdoing, and was or should have been aware of his or her overall contribution to and furtherance of the wrongdoing.

82.    At all times relevant hereto, each of the Individual Defendants was the agent of each of the other Individual Defendants and of Fisker and was at all times acting within the course and scope of such agency.

## DERIVATIVE AND DEMAND FUTILITY ALLEGATIONS

83.     Plaintiff brings this action derivatively for the benefit of Fisker to redress the injuries suffered, and to be suffered, as a proximate result of the Individual Defendants' breaches of fiduciary duties and other violations of law including the federal securities laws.

84.    Fisker is named solely as a nominal party in this action. This is not a collusive action to confer jurisdiction on this Court that it would not otherwise have.

85.    Plaintiff is, and has been at all relevant times, a shareholder of Fisker. Plaintiff will adequately and fairly represent the interests of Fisker in enforcing and prosecuting its rights, and, to that end, has retained competent counsel, experienced in derivative litigation, to enforce and prosecute this action.

86.    A pre-suit demand on the Board of Fisker is futile and, therefore, excused. At the time of filing of this complaint, the Board consists of the following

eight individuals: H. Fisker, Gupta-Fisker, Greuel, Hickson, McDermott, Randall, Watt, and Zuklie (the "Director Defendants"). Plaintiff needs only to allege demand futility as to four of the eight members of the Board at the time of filing this complaint.

87.     The Director Defendants are incapable of making an independent and disinterested decision to institute and vigorously prosecute this action. The Director Defendants each face a substantial likelihood of liability as a result of their misconduct by knowingly or recklessly making and/or causing Fisker to make false and misleading statements and omissions of material fact. The Director Defendants had a fiduciary duty to ensure the accuracy of the Company's SEC filings, press releases, and other public statements and presentations concerning Fisker's business, operations, prospects, internal controls, and financial statements.

88.     The Director Defendants owed and owe a duty to, in good faith and with due diligence, exercise reasonable inquiry, oversight, and supervision to ensure that the Company's internal controls were sufficiently robust and effective and were being implemented effectively, and to ensure that the Board's duties were being discharged in good faith and with the required diligence and due care. Instead, they knowingly and consciously reviewed, authorized, and/or caused the publication of the materially false and misleading statements discussed above that caused the Company's stock to trade at artificially inflated prices.

89.     Each Director Defendant's participation in this scheme means that none of the current Board members are able to impartially investigate the charges and decide whether to pursue legal action against themselves and the other Director Defendant. Due to their failure to fulfill their fiduciary duties, each Director Defendant knowingly and/or recklessly caused or permitted Fisker to make the false and misleading statements and/or omissions of material fact described herein. Each

Director Defendant solicited the August 2023 Proxy. These false and misleading statements and/or omissions of material fact included material misrepresentations and/or omissions made or withheld from stockholders and the investing public in order to conceal Fisker's financial problems and to artificially inflate the price of Fisker's stock. Accordingly, these facts show that the Director Defendants could not exercise disinterested business judgment in considering a demand, and as a result, demand is futile.

90.     Additional reasons demonstrate that demand on H. Fisker is futile. Preliminarily, the August 2023 Proxy admits that H. Fisker is not independent. As H. Fisker is the co-founder, CEO, Chairman, and a controlling shareholder, he is not independent. In his positions at Fisker, the Company provides H. Fisker with significant compensation. In his leadership roles, including CEO, H. Fisker is ultimately responsible for all of the Company's false and misleading statements and omissions made at all relevant times. H. Fisker solicited the August 2023 Proxy and made public statements in press releases. He was the Company's highest-ranking director and officer, and if he conducted any oversight of Fisker's internal controls, it was completely and utterly inadequate. This conscious disregard resulted in his failure to protect the Company's assets and act in the Company's best interest. It also resulted in the Company's making false and misleading statements. Further, Defendant H. Fisker is a defendant in the Securities Class Action and thus exposed to substantial likelihood of liability for this misconduct. Additionally, H. Fisker is the husband of Gupta-Fisker. Given this marital relationship, H. Fisker is unable to evaluate his wife's actions objectively as he does not have independence from her. As Gupta-Fisker is a defendant in the Securities Class Action, she too faces a substantial likelihood of personal liability for the same misconduct. In sum, H. Fisker is not independent or disinterested in considering a demand.

91.     Additional reasons demonstrate that demand on Gupta-Fisker is futile. Preliminarily, the August 2023 Proxy admits that Gupta-Fisker is not independent. As Gupta-Fisker is the co-founder, COO, CFO, and a controlling shareholder, she is not independent. In her positions at Fisker, the Company provides Gupta-Fisker with significant compensation. In her leadership roles, Gupta-Fisker is ultimately responsible for the Company's false and misleading statements and omissions made at all relevant times. Gupta-Fiker solicited the August 2023 Proxy, signed the 2Q23 10-Q, and made other public statements on conference calls. She was a high-ranking director and officer, and if she conducted any oversight of Fisker's internal controls, it was completely and utterly inadequate. This conscious disregard resulted in her failure to protect the Company's assets and act in the Company's best interest. It also resulted in the Company's making false and misleading statements. Further, Defendant Gupta-Fisker is a defendant in the Securities Class Action and thus exposed to substantial likelihood of liability for this misconduct. Additionally, Gupta-Fisker is the wife of H. Fisker. Given this marital relationship, Gupta-Fisker is unable to evaluate her husband's actions objectively as she does not have independence from him. As H. Fisker is a defendant in the Securities Class Action, he too faces a substantial likelihood of personal liability for the same misconduct. In sum, Gupta-Fisker is not independent or disinterested in considering a demand.

92.     Additional reasons demonstrate that demand on Greuel is futile. Defendant Greuel has served as a Company director since June 2020. As a director of Fisker, Greuel receives significant compensation for her role as a director. Additionally, in her role as a director, Greuel conducted little, if any, oversight of the scheme to cause Fisker to make false and misleading statements, consciously disregarded her duties to monitor such controls over reporting and engagement in

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

the scheme, and consciously disregarded her duties to protect corporate assets. As a result, Defendant Greuel breached her fiduciary duties, faces a substantial likelihood of liability, and is not independent or disinterested. Thus, demand upon Defendant Greuel is futile and excused.

93.    Additional reasons demonstrate that demand on Hickson is futile. Defendant Hickson has served as a Company director since July 2020. As a director of Fisker, Hickson receives significant compensation for his role as a director. Additionally, in his role as a director, Hickson conducted little, if any, oversight of the scheme to cause Fisker to make false and misleading statements, consciously disregarded his duties to monitor such controls over reporting and engagement in the scheme, and consciously disregarded his duties to protect corporate assets. As a result, Defendant Hickson breached his fiduciary duties, faces a substantial likelihood of liability, and is not independent or disinterested. Thus, demand upon Defendant Hickson is futile and excused.

94.    Additional reasons demonstrate that demand on McDermott is futile. Defendant McDermott has served as a Company director since October 2020. As a director of Fisker, McDermott receives significant compensation for his role as a director. Additionally, in his role as a director, McDermott conducted little, if any, oversight of the scheme to cause Fisker to make false and misleading statements, consciously disregarded his duties to monitor such controls over reporting and engagement in the scheme, and consciously disregarded his duties to protect corporate assets. As a result, Defendant McDermott breached his fiduciary duties, faces a substantial likelihood of liability, and is not independent or disinterested. Thus, demand upon Defendant McDermott is futile and excused.

95.    Additional reasons demonstrate that demand on Randall is futile. Defendant Randall has served as a Company director since March 2020. As a

– 29 –

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

director of Fisker, Randall receives significant compensation for his role as a director. Additionally, in his role as a director, Randall conducted little, if any, oversight of the scheme to cause Fisker to make false and misleading statements, consciously disregarded his duties to monitor such controls over reporting and engagement in the scheme, and consciously disregarded his duties to protect corporate assets. As a result, Defendant Randall breached his fiduciary duties, faces a substantial likelihood of liability, and is not independent or disinterested. Thus, demand upon Defendant Randall is futile and excused.

96.    Additional reasons demonstrate that demand on Watt is futile. Defendant Watt has served as a Company director since June 2020. As a director of Fisker, Watt receives significant compensation for her role as a director. Additionally, in her role as a director, Watt conducted little, if any, oversight of the scheme to cause Fisker to make false and misleading statements, consciously disregarded her duties to monitor such controls over reporting and engagement in the scheme, and consciously disregarded her duties to protect corporate assets. As a result, Defendant Watt breached her fiduciary duties, faces a substantial likelihood of liability, and is not independent or disinterested. Thus, demand upon Defendant Watt is futile and excused.

97.    Additional reasons demonstrate that demand on Zuklie is futile. Defendant Zuklie has served as a Company director since March 2021. As a director of Fisker, Zuklie receives significant compensation for his role as a director. Additionally, in his role as a director, Zuklie conducted little, if any, oversight of the scheme to cause Fisker to make false and misleading statements, consciously disregarded his duties to monitor such controls over reporting and engagement in the scheme, and consciously disregarded his duties to protect corporate assets. As a result, Defendant Zuklie breached his fiduciary duties, faces a substantial likelihood

of liability, and is not independent or disinterested. Thus, demand upon Defendant Zuklie is futile and excused.

98.     At all times during the Relevant Period, Defendants Greuel, Hickson, and McDermott served on Fisker's Audit Committee. Defendants Greuel, Hickson, and McDermott were required to abide by the Charter. However, each violated the Charter by participating in and knowingly approving Fisker's false and misleading financial statements included in SEC filings and public statements. In particular, Defendants Greuel, Hickson, and McDermott were required to read and understand the financial statements to ensure that they were accurate and abided by legal and regulatory requirements. They were also required to assist the Board in: performing Fisker's internal auditing; overseeing the principal risk exposures facing the Company and risk mitigation efforts; and reviewing and discussing Fisker's "accounting and financial reporting processes and systems of internal control" with management and the independent auditor. Defendants Greuel, Hickson, and McDermott breached their fiduciary duties by failing to: adequately review and discuss Fisker's false and/or misleading SEC filings discussed herein; adequately perform their risk assessment, management, and mitigation functions; ensure adequate oversight of the internal controls over financial reporting; and follow disclosure controls and procedures. These failures and breaches mean that they are not disinterested, further showing that demand is excused.

99.     Additionally, the Director Defendants violated the Code by permitting Fisker to issue materially false and misleading statements to the public which included failing to: act with integrity; avoid conflicts of interest; ensure Fisker's disclosures were accurate; ensure Fisker complied with applicable laws, rules, and regulations, and promptly report known violations of the Code and the law. Given their violation of the Code, the Director Defendants are not impartial and demand

is excused.

100.   The Company has been and will continue to be exposed to significant losses because of the wrongdoing complained of herein. The Director Defendants, however, have not initiated any lawsuits against themselves or any others who were responsible for the wrongful conduct in an effort to recoup damages Fisker has suffered and will continue to suffer.. Thus, any demand upon the Director Defendants is futile.

101.   The Director Defendants are not afforded protections under legitimate business judgment as their conduct described herein was based on bad faith and intentional, reckless, or disloyal misconduct. Thus, none of the Director Defendants can claim exculpation from their violations of duty pursuant to Fisker's charter (to the extent such a provision exists). As a majority of the Director Defendants face a substantial likelihood of liability, they are self-interested in the transactions challenged herein and cannot be presumed to be capable of exercising independent and disinterested judgment about whether to pursue this action on behalf of the shareholders of the Company. Accordingly, demand is excused as being futile.

102.   The acts complained of herein constitute violations of fiduciary duties owed by the Company's officers and directors, and these acts are incapable of ratification.

103.   The Director Defendants may also be protected against personal liability for their acts of mismanagement and breaches of fiduciary duty alleged herein by directors' and officers' liability insurance if they caused Fisker to purchase it for their protection with corporate funds, *i.e.*, monies belonging to the stockholders of the Company. If there is a directors' and officers' liability insurance policy covering the Director Defendants, it may contain provisions that eliminate coverage for any action brought directly by Fisker against the Director Defendants,

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

known as, *inter alia*, the "insured-versus-insured exclusion." As a result, if the Director Defendants were to sue themselves or certain of the officers of the Company, there would be no directors' and officers' insurance protection. Accordingly, the Director Defendants cannot be expected to bring such a suit. On the other hand, if the suit is brought derivatively, as this action is brought, such insurance coverage, if such an insurance policy exists, will provide a basis for Fisker to effectuate a recovery. Thus, demand on the Director Defendants is futile and, therefore, excused.

104.   If there is no directors' and officers' liability insurance, then the Director Defendants will not cause the Company to sue the Individual Defendants named herein, since, if they did, they would face a large uninsured individual liability. Accordingly, demand is futile in that event, as well.

105.   A demand upon the Board is excused as futile for all of the reasons set forth herein.

## COUNT I

**Against the Individual Defendants for Violations of §10(b) of the Exchange Act, 15 U.S.C. § 78(j), and Rule 10b-5, 17 C.F.R. §240.10b-5**

106.   Plaintiff incorporates by reference and realleges each and every allegation contained above, as though fully set forth herein.

107.   The Individual Defendants violated Section 10(b) of the Exchange Act, 15 U.S.C. § 78j(b), and Rule 10b-5 promulgated thereunder by the SEC.

108.   The Individual Defendants, individually and in concert, directly or indirectly, disseminated or approved the false statements specified above, which they knew or deliberately disregarded were misleading in that they contained misrepresentations and failed to disclose material facts necessary in order to make the statements made, in light of the circumstances under which they were made,

not misleading.

109.   The Individual Defendants violated Section 10(b) of the Exchange Act and Rule 10b-5 in that they: (i) employed devices, schemes and artifices to defraud; (ii) made untrue statements of material facts or omitted to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; or (iii) engaged in acts, practices and a course of business that operated as a fraud or deceit upon Plaintiff and others similarly situated.

110.   The Individual Defendants acted with scienter because they: (i) knew that the public documents and statements issued or disseminated in the name of Fisker were materially false and misleading; (ii) knew that such statements or documents would be issued or disseminated to the investing public; and (iii) knowingly and substantially participated or acquiesced in the issuance or dissemination of such statements or documents as primary violations of the securities laws.

111.   The Individual Defendants employed devices, schemes, and artifices to defraud while in possession of adverse, material, non-public information and engaged in acts, practices and a course of conduct that included the making of, or participation in the making of, untrue and/or misleading statements of material facts and/or omitting to state material facts necessary in order to make the statements made about Fisker not misleading.

112.   The Individual Defendants, as top executives and directors of the Company, are liable as direct participants in the wrongs complained of herein. Through their positions of control and authority as directors and officers of the Company, the Individual Defendants were able to and did control the conduct complained of herein and the content of the public statements disseminated by

– 34 –

Fisker.

113.   The Individual Defendants acted with scienter during the Relevant Period, in that they either had actual knowledge of the scheme and the misrepresentations and/or omissions of material facts set forth herein or acted with reckless disregard for the truth in that they failed to ascertain and to disclose the true facts, even though such facts were available to them. The Individual Defendants were the top executives of the Company, or received direct briefings from them, and were therefore directly responsible for the scheme set forth herein and for the false and misleading statements and/or omissions disseminated to the public through filings with the SEC.

114.   Plaintiff, on behalf of Fisker, has no adequate remedy at law.

## COUNT II

**Against Defendants H. Fisker, Gupta-Fisker, and Finnucan for Contribution Under Sections 10(b) and 21D of the Exchange Act**

115.   Plaintiff incorporates by reference and realleges each and every allegation set forth above as though fully set forth herein.

116.   The Securities Class Action asserts claims against the Company, H. Fisker, Gupta-Fisker, and Finnucan for violations of Sections 10(b) and 20(a) of the Exchange Act and Rule 10b-5 promulgated thereunder. Upon a finding a liability in the Securities Class Action for these violations, the Company's liability will be due, in whole or in part, to the H. Fisker's, Gupta-Fisker's, and Finnucan's willful and/or reckless violations of their obligations as described herein.

117.   H. Fisker's, Gupta-Fisker's, and Finnucan's positions of authority and control as officers and/or directors of Fisker enabled them to, and they did, either directly and/or indirectly, exercise control over Fisker's business and corporate affairs, including for the wrongful acts and omissions described herein and in the

Securities Class Action.

118.   Accordingly, H. Fisker, Gupta-Fisker, and Finnucan are liable under Section 10(b) of the Exchange Act, 15 U.S.C. § 78j(b), which creates an implied private right of action for contribution, and Section 21D of the Exchange Act, 15 U.S.C. § 78u-4(f), which governs the application of a private right of action for contribution arising out of violations of the Exchange Act.

119.   As such, Fisker is entitled to receive all appropriate contribution or indemnification from H. Fisker, Gupta-Fisker, and Finnucan.

## COUNT III

### Against the Individual Defendants for Breach of Fiduciary Duties

120.   Plaintiff incorporates by reference and realleges each and every allegation set forth above as though fully set forth herein.

121.   Each Individual Defendant owed Fisker the duty to exercise candor, good faith, and loyalty and to exercise reasonable inquiry, oversight, and supervision in the management and administration of its business and affairs. The Individual Defendants violated and breached these fiduciary duties of candor, good faith, and loyalty and the duty to exercise reasonable inquiry, oversight, and supervision.

122.   The Individual Defendants' conduct described herein was due to their intentional or reckless breach and/or disregard of the fiduciary duties they each owed to Fisker to protect Fisker's rights and interests. The Individual Defendants intentionally or recklessly breached or disregarded their fiduciary duties to protect the rights and interests of Fisker.

123.   Despite their fiduciary duties, the Individual Defendants willfully or recklessly, made, or caused or permitted the Company to make, false and misleading statements and omissions of material fact that failed to disclose, *inter*

*alia,* that: (i) the Company had "material weaknesses" in "internal control over financial reporting"; (ii) the Company inaccurately accounted for certain costs and expenses; (iii) that weaknesses with financial reporting and inaccurate accounting would likely result in delayed filing of the Company's Form 10-Q; and (iv) the Company had delivery and service infrastructure issues that were negatively impacting delivery. The statements were also false and misleading because they did not disclose delivery and service infrastructure problems, instead focusing on positive statements about ramping up the production phase.

124. Accordingly, Fisker's public statements were materially false, misleading, and lacked a reasonable basis during the Relevant Period, thereby causing the stock to trade at artificially inflated prices.

125. The Individual Defendants further breached their fiduciary duties by causing and/or choosing not to correct the Company's false and/or misleading statements and/or by failing to provide the omitted material facts referenced herein, making them personally liable to Fisker for breaching their fiduciary duties.

126. The Individual Defendants also failed to maintain an adequate system of oversight, disclosure controls and procedures, and internal controls in breach of their fiduciary duties.

127. The Individual Defendants possessed knowledge, either direct or indirect, that they were responsible for the Company's inappropriate participation in the fraudulent schemes described herein, its failure to maintain sufficient internal controls, and its failure to correct its public statements and misrepresentations.

128. Despite the Individual Defendants' knowledge of the misrepresentations and omissions of material fact described herein, they acted with reckless disregard for the truth by choosing to engage in the fraudulent schemes,

failing to maintain adequate internal controls, and failing to disclose the omitted material facts, even though the true facts were available to them.

129.   The aforementioned unlawful conduct was carried out intentionally or recklessly with the intention and consequence of inflating the value of Fisker's securities.

130.   Had the Individual Defendants been acting in good faith, they would have taken appropriate preventative or remedial actions regarding the false and misleading statements and/or the inadequate internal controls.

131.   As such, the Individual Defendants' actions were not a good-faith exercise of prudent business judgment to protect and promote the Company's corporate interests.

132.   As a direct and proximate result of the Individual Defendants' breaches of their fiduciary obligations, Fisker has incurred and continues to incur significant damages. The Individual Defendants are liable to the Company for these damages arising from their misconduct.

133.   Plaintiff, on behalf of Fisker, has no adequate remedy at law.

## COUNT IV

### Against the Individual Defendants for Aiding and Abetting Breach of Fiduciary Duty

134.   Plaintiff incorporates by reference and realleges each and every allegation set forth above as though fully set forth herein.

135.   In committing the wrongful acts alleged herein, the Individual Defendants have pursued or joined in the pursuit of a common course of conduct and have acted in concert with and conspired with one another in furtherance of their wrongdoing. The Individual Defendants caused the Company to conceal the facts as alleged herein. The Individual Defendants further aided and abetted and/or assisted each other in breaching their respective duties.

– 38 –

136. The purpose and effect of the conspiracy, common enterprise, and/or common course of conduct were, among other things: to (i) facilitate and disguise the Individual Defendants' violations of law, including breaches of fiduciary duty and unjust enrichment; (ii) conceal adverse information concerning the Company's operations, financial condition, future business prospects, and internal controls; and (iii) artificially inflate the Company's stock price

137. The Individual Defendants accomplished their conspiracy, common enterprise, and/or common course of conduct by causing the Company purposefully, recklessly, or with gross negligence to conceal material facts, fail to correct such misrepresentations, and violate applicable laws. In furtherance of this plan, conspiracy, and course of conduct, Individual Defendants collectively and individually took the actions set forth herein. The Individual Defendants described herein were direct, necessary, and substantial participants in the common enterprise, and/or common course of conduct complained here because the action described herein occurred under the authority and approval of the Board.

138. Each of the Individual Defendants aided, abetted, and rendered substantial assistance in the wrongs complained of herein. In taking such actions to substantially assist the commission of the wrongdoing complained of herein, each of the Individual Defendants acted with actual or constructive knowledge of the primary wrongdoing, either took direct part in or substantially assisted the accomplishment of that wrongdoing, and was or should have been aware of his or her overall contribution to and furtherance of the wrongdoing

139. At all times relevant hereto, each of the Individual Defendants was the agent of each of the other Individual Defendants and Fisker and was at all times acting within the course and scope of such agency.

140. Through their participation in the wrongful acts contained herein,

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

including causing or permitting the Company to make, false and misleading statements and omissions of material fact described above, each Individual Defendant has encouraged, facilitated and advanced the other Individual Defendants in breaching their fiduciary duties. Through these actions, the Individual Defendants have conspired with each other and aided and abetted each other to breach their fiduciary duties to Fisker and to engage in the *ultra vires* and illegal conduct described herein.

## <u>COUNT V</u>

### Against the Individual Defendants for Waste of Corporate Assets

141.   Plaintiff incorporates by reference and realleges each and every allegation set forth above as though fully set forth herein.

142.   In breach of their fiduciary duties, the Individual Defendants willfully, or in the alternative recklessly, made, or caused or permitted the Company to make, false and misleading statements and omissions of material fact that failed to disclose, *inter alia,* that the Company: (i) had "material weaknesses" in "internal control over financial reporting"; (ii) had inaccurately accounted for certain costs and expenses; (iii) that weaknesses with financial reporting and inaccurate accounting would likely result in delayed filing of its Form 10-Q; and (iv) had delivery and service infrastructure issues that were negatively impacting delivery. The statements contained in it were also false and misleading because they did not disclose delivery and service infrastructure problems, instead focusing on positive statements about ramping up the production phase.

143.   As a result of the foregoing misconduct, the Individual Defendants wasted and/or caused the waste of corporate assets by, *inter alia,* approving excessive compensation and salaries tied to the Company's purported success, incurring and paying defense and litigation costs associated with the Securities

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

Class Action and exposing the company to legal liability; and causing the Company to lose financing and business from investors and customers who no longer trust the Company.

144.   Due to this waste of corporate assets, the Individual Defendants are liable to the Company.

145.   Plaintiff, on behalf of Fisker, has no adequate remedy at law.

## COUNT VI

### Against the Individual Defendants for Unjust Enrichment

146.   Plaintiff incorporates by reference and realleges each and every allegation set forth above as though fully set forth herein.

147.   Through their wrongful acts and omissions and their breaches of fiduciary duties, including making or causing or permitting the Company to make false and misleading statements and/or to omit material facts as described above, the Individual Defendants were unjustly enriched at the Company's expense and to its detriment.

148.   The Individual Defendants' unjust enrichment took the form of bonuses, stock options, and/or similar compensation paid by Fisker to them which was tied to their performance and/or to Fisker's artificially inflated valuation. As stockholders and representatives of the Company in this matter, Plaintiff now seeks restitution from the Individual Defendants and an order from this Court disgorging the improper benefits, profits, and/or compensation paid to the Individual Defendants arising from their wrongful acts and omissions and their breaches of fiduciary duties.

149.   The unjust enrichment described herein is a direct and proximate result of the Individual Defendants' misconduct and has resulted in substantial damages to the Company and its stockholders, as described herein.

– 41 –

150.   Plaintiff, on behalf of Fisker, has no adequate remedy at law.

## COUNT VII

### Against Individual Defendants for Gross Mismanagement

151.   Plaintiff incorporates by reference and realleges each and every allegation set forth above, as though fully set forth herein.

152.   By their actions alleged herein, the Individual Defendants, either directly or through aiding and abetting, abandoned and abdicated their responsibilities and fiduciary duties with regard to prudently managing the assets and business of Fisker in a manner consistent with the operations of a publicly held corporation.

153.   As a direct and proximate result of the Individual Defendants' gross mismanagement and breaches of duty alleged herein, Fisker has sustained and will continue to sustain significant damages.

154.   As a result of the misconduct and breaches of duty alleged herein, the Individual Defendants are liable to the Company.

155.   Plaintiff, on behalf of Fisker, has no adequate remedy at law.

## COUNT VIII

### Against Individual Defendants for Abuse of Control

156.   Plaintiff incorporates by reference and realleges each and every allegation set forth above, as though fully set forth herein.

157.   The Individual Defendants' misconduct alleged herein constituted an abuse of their ability to control and influence Fisker, for which they are legally responsible.

158.   As a direct and proximate result of the Individual Defendants' abuse of control, Fisker has sustained significant damages. As a result of the misconduct alleged herein, the Individual Defendants are liable to the Company.

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

159.   Plaintiff, on behalf of Fisker, has no adequate remedy at law.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff prays for relief and judgment, as follows:

A.   Awarding money damages against all Individual Defendants, jointly and severally, for all losses and damages suffered as a result of the acts and transactions complained of herein, together with pre-judgment interest, molded in a fashion to ensure the Individual Defendants do not participate therein or benefit thereby;

B.   Directing all Individual Defendants to account for all damages caused by them and all profits and special benefits and unjust enrichment they have obtained as a result of their unlawful conduct, including all salaries, bonuses, fees, stock awards, options and common stock sale proceeds, and imposing a constructive trust thereon;

C.   Awarding punitive damages;

D.   Awarding costs and disbursements of this action, including reasonable attorneys' fees, accountants' and experts' fees, costs, and expenses; and

E.   Granting such other and further relief as the Court deems just and proper.

## JURY TRIAL DEMANDED

Plaintiff hereby demands a trial by jury.

Dated: March 7, 2024                    Respectfully submitted,

**THE ROSEN LAW FIRM, P.A.**

/s/Laurence M. Rosen
Laurence M. Rosen, Esq. (SBN 219683)
355 S. Grand Avenue, Suite 2450

– 43 –

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

Los Angeles, CA 90071
Telephone: (213) 785-2610
Facsimile: (213) 226-4684
Email: lrosen@rosenlegal.com

*Counsel for Plaintiff*

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

## **VERIFICATION**

       I, Hamid Karamian am a plaintiff in the within action. I have reviewed the allegations made in this shareholder derivative complaint, know the contents thereof, and authorize its filing.  To those allegations of which I have personal knowledge, I believe those allegations to be true.  As to those allegations of which I do not have personal knowledge, I rely upon my counsel and their investigation and believe them to be true. I declare under penalty of perjury that the foregoing is true and correct.

      Executed:   3/1/2024

                         DocuSigned by:

                         2B62572872E240E...

                 Hamid Karamian